IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:04-CV-580-H(2)

| | |
|---|---|
| LUMBERMENS MUTUAL CASUALTY COMPANY | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) **MEMORANDUM AND RECOMMENDATION**<br>) |
| FIRST INSURANCE SERVICES, INC., | )<br>) |
| Defendant. | |

This matter is before the court on Defendant First Insurance Services, Inc.'s ("the Agency") motion for summary judgment. [DE-39]. Plaintiff Lumbermens Mutual Casualty Company ("Kemper")[1] has responded. [DE-44]. Therefore, this matter is ripe for adjudication.

## STATEMENT OF THE CASE

This is a diversity action between two insurance companies over payment on a homeowners insurance policy after a fire destroyed the house that was the subject of the policy. The Agency assisted John Graham ("Graham"), a homeowner, in obtaining homeowner's insurance from Kemper. After the fire, Kemper paid on the insurance policy to replace the house. Kemper now argues that the Agency is liable for the net amount paid by Kemper due to the fire loss under the Graham policy based on claims of breach of

---

[1] Lumbermens Mutual Casualty Company is a subsidiary of Kemper Insurance Group. The Graham policy was issued by another Kemper Subsidiary, American Protection Insurance Company. For clarity, the court will refer to Plaintiff as Kemper.

contract, breach of fiduciary duty, fraudulent misrepresentation, and negligence. [DE-1]. The Agency filed the current summary judgment motion on March 6, 2008.

## STATEMENT OF THE FACTS

The facts in this case, when viewed in the light most favorable to Kemper, the non-moving party, are as follows:

John and Sally Graham began construction on a new home located at 421 Rosemont in Durham, NC in October of 2001. On April 13, 2003, a fire consumed the house and destroyed it. Kemper paid approximately $3 million to replace both the house and its contents. Kemper is assured a minimum recovery of $2 million from the general contractor, not including costs and expenses in obtaining the recovery.

In the fall of 2002, during the construction of their home, Graham met with Barry Curtis, of the Agency, to discuss insurance for the home that he was in the process of building. Def. Mot. for S.J., App. Tab 9, Curtis Dep. at 11-12. Graham told Curtis that the house would be 6,400 square feet and would cost $800,000 to construct. Def. Mot for S.J., App. Tab 19, Curtis Dec. at 3. In order to ensure proper coverage, Curtis suggested seeking a higher replacement cost of $850,000. Id.

Curtis passed on information regarding Graham's house to Cathy Bowling, a licensed agent who was the Agency's personal lines department manager. Id. at 4. Bowling relied on the information provided by Graham in seeking coverage for the Graham house from Kemper. Def. Mot. for S.J. App. Tab 18, Bowling Dec. at 2. Bowling concluded that the Grahams' house was in the Parkwood Fire District area in Fire Protection Class Five. Usually a Fire Protection Class Five designation requires that the house be within 1,000 feet of a fire hydrant. The Graham house was not within 1,000 feet

2

of a fire hydrant, and there was no fire hydrant in the vicinity at all. However, Bowling knew that houses in the Parkwood Fire District that were within five miles of the Parkwood Fire Station, regardless of their distance from a fire hydrant, were classified as Protection Class Five according to the Insurance Service Office ("ISO") guidelines. Id. at 3.

The Agency had authority to bind homeowner's coverage on behalf of Kemper for houses with replacement costs up to $600,000. Id. For houses with replacement costs over $600,000, the Agency had to get permission from Kemper for coverage. Id. Because the replacement cost for the Graham house was more than $600,000, Bowling called Amanda Firth, the Kemper underwriter who normally handled applications submitted through the Agency. Id. at 3-4. Firth testified that she requested Bowling to fill out a high value questionnaire in order to evaluate coverage for the Graham house. There is disagreement about whether a high value questionnaire was filled out. Bowling does not remember being asked by Firth to complete a questionnaire and does not believe she filled out the form. Firth did not keep a copy but remembers receiving it and having it list the Graham house as a Fire Protection Class 5, which generally requires a fire hydrant to be within 1,000 feet of the house. Plaint. Res., ex. D at 85-86, 104-105. Bowling remembers discussing possible coverage for the Graham house with Firth and telling Firth that the house was in Fire Protection Class 5. Neither Bowling nor Firth remembers discussing the distance of the nearest fire hydrant. Def. Mot. for S.J. Tab 10, Firth Depo. at 101-102, Def. Mot. for S.J. Tab 18, Bowling Dec. at 4.

Firth consulted her supervisor, Ingrid Schultz, about whether Kemper should grant coverage. Firth testified that she discussed the high value questionnaire with Schultz. In addition, Schultz wanted to find out information about the Graham's automobiles because

3

when Kemper covered high value homes, it generally wanted to underwrite the whole account, including umbrella businesses such as cars. Def. Mot. for S.J. Tab 10, Firth depo. at 97-98. Schultz approved the policy. Id. at 96. The policy was issued with an effective date of February 15, 2003 through February 15, 2004.

Bowling then submitted an online application providing information about the Graham house. Def. Mot. for S.J. Tab 18, Bowling Dec. at 5. She listed the house as having a replacement cost of $850,000 and a Fire Protection Class of Five. In addition, there was a space on the form to enter distance to a fire hydrant; Bowling entered 1,000 feet. She averred that the reason she entered 1,000 feet was that she could not upload the form without entering a number in that slot. She indicated that the application was "submitted bound" because Schultz had previously verbally approved the policy. Bowling then printed the information from the application onto an "Acord Form Application." Def. Mot. for S.J. Tab 19, Curtis Dec. At 5.

On February 26, 2003, Curtis had lunch with Graham to deliver the policy that the Agency had received from Kemper and to have Graham sign the Acord Form Application, which was for the Agency's files. At that lunch, Graham told Curtis that an appraisal by his bank for the permanent loan showed the replacement cost of the house to be approximately $1.5 million, substantially more than the $850,000 replacement cost that had been relayed to Kemper. Curtis testified that he did not let Kemper know about this discrepancy because a Kemper-retained inspector was scheduled to inspect the house the following week and would determine the appraisal value.

The inspection was delayed by a few weeks. On March 26, 2003, the inspector conducted the inspection of the Graham house. The report stated that the replacement

4

cost of the house was $1,634,442.00, that it was five miles from the Parkwood Fire Station, and that there was no fire hydrant in the vicinity. Plaint. Resp., Tab 1. The inspector uploaded the report to its website, to which Kemper had access, on Friday, April 11, 2003. The fire that destroyed the Graham house occurred on April 17, 2003.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate pursuant to Rule 56 of the Federal Rules of Civil Procedure when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). As this court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues. Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curium). Only disputes between the parties

5

over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F. Supp. at 125.

## II. Analysis

The Agency asserts that there are no genuine issues of material fact that are outstanding. Instead, the Agency requests that the court grant summary judgment in its favor, claiming (1) that they did not make any knowing or negligent misrepresentations, (2) Curtis acted reasonably in not informing Kemper that the replacement cost of the Graham's house was much higher than first assessed after his February 26 lunch meeting with Graham, and (3) that the Agency did not breach its contract with Kemper. For the reasons discussed below, the court recommends that the summary judgment motion be granted in part, and denied in part.

### A. Negligent and Fraudulent Misrepresentations

North Carolina courts have described when a tortfeasor is liable for engaging in negligent misrepresentation:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Forbes v. Par Ten Group, Inc., 394 S.E.2d 643, 648 (N.C. App. 1990); see also Raritan River Steel Co. V. Cherry Bekaert & Holland, 367 S.E.2d 609, 612 (N.C. 1988) ("The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on

6

information prepared without reasonable care by one who owed the relying party a duty of care."). Therefore, to prevail on this claim, Kemper must show that the Agency provided false information to it regarding the Graham house, that Kemper justifiably relied on that information to its detriment, and that the Agency failed to use reasonable care in communicating the information.

Here, there are three kinds of statements made by the Agency to Kemper that are at issue: (1) the Fire Protection Class of the house; (2) the hydrant distance; and (3) the replacement cost of the house. The first and last statements involve a legal determination but the second statement raises factual issues that should be resolved at trial.

### 1. *Fire Protection Class of the House*

The Agency argues that it did not make false statements regarding the Fire Protection Class of the Graham house, and therefore summary judgment on this issue should be granted. The court agrees. The Agency presented evidence that houses in the Chatham County portion of the Parkwood Fire District were rated as Fire Protection Class Five if located within five miles of the Parkwood Fire Station, according to the ISO guidelines. Def. Mot. for S.J., Bowling Dec., Tab 18 at 3. Bowling contacted a fire department representative who confirmed that the Graham house was within five miles of the Parkwood Fire Station. Schultz testified at her deposition that Kemper uses the ISO guidelines to determine Fire Protection Class. Plain. Res., Schultz Depo., Ex. D at 113.

Therefore, the statements the Agency made to Kemper that the Graham house was categorized as a Fire Protection Class Five were not false. Kemper provided evidence that usually distance from a fire hydrant establishes the Fire Protection Class, and that a distance of 1,000 feet usually corresponds to a Fire Protection Class of Five. In this case,

7

a fire hydrant was not located within 1,000 feet of the Graham home. Nonetheless, in this instance the ISO establishes that if a house in Chatham County was located within five miles of the Parkwood Fire Station, as the Graham's house was, then it was classified as a Protection Class Five. Accordingly, the Agency did not make a false statement with regard to the Fire Protection Class and a claim for negligent misrepresentation is not viable.

### 2. *Fire Hydrant Distance from House*

Next, the Agency argues that the fire hydrant distance was immaterial to a determination of the Fire Protection Class, and therefore, any statements made to Kemper about the fire hydrant distance could not qualify as a negligent misrepresentation. Firth, an employee of Kemper, testified that she considers fire hydrant distance to be important because to her knowledge, it is always a criteria in determining protection class. Def. Motion for S.J., Tab 10, Firth Depo. at 102. This is not the case, because as discussed in the prior section, the ISO listed the houses in the Parkwood Fire District as Fire Protection Class Five, even though there was no fire hydrant in the vicinity. Nonetheless, Firth also testified that even if a house was classified as a Fire Protection Class Five, she would still want to know the distance of the house from a fire hydrant. Id. at 132. Schultz also stated that even if she knew that a house was in a Fire Protection Class Five, "we always review the hydrant distance." Def. Mot. for S.J., Tab 14, Schultz Depo. at 106. At other times, both Firth and Schultz said that what really interested them was the Fire Protection Class.

There is a question as to what information Bowling provided to Firth at Kemper when requesting coverage for the Grahams. Bowling said that she does not recall discussing hydrant distance with Firth, but if they did talk about hydrant distance, she

8

would have told Firth that the fire hydrant requirements did not apply in the Graham's Fire District. Id., Tab 18, Bowling Dec. at 4. Firth testified at her deposition that she does not remember having a conversation with Bowling about fire hydrant distance, and she does not believe that such a conversation took place because she could not imagine approving the request for coverage if she knew that there was no fire hydrant in the vicinity of the Graham house. Id., Tab 8, Firth Depo. at 101. Firth further testified she had Bowling fill out a High Value Homeowners Questionnaire that had a place for the Agency to write in the "# Of Feet To Hydrant." Plain. Reply Ex. F at 1. She cannot remember whether Bowling filled in a distance. Bowling denied filling out a questionnaire and the questionnaire has not been located.

The evidence regarding the information Bowling provided to Kemper with regard to hydrant distance leaves various material factual questions to be determined. Namely, did the Agency tell Kemper that the Graham house was 1,000 feet from a fire hydrant before Kemper bound coverage? And did Kemper rely on that information or look only to the Fire Protection Class in deciding to grant coverage for the Graham's house? These questions are not easily answered because of the conflicting evidence in the record.

"Generally, issues of negligence . . . are ordinarily not susceptible of summary adjudication either for or against the claimant, but should be resolved by trial in the ordinary manner. Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP, 350 S.E.2d 320, 324 (N.C. 1999) (internal quotations omitted). In particular, in negligent misrepresentation cases, the determination of whether liability accrues is a highly fact-specific inquiry. Id. at 325. "As such, summary judgment is seldom appropriate in [negligent misrepresentation] . . . cases." Id. Accordingly, this is an issue for the jury to determine.

9

### 3. *Understatement of Replacement Cost*

Finally, the Agency argues that it was not responsible for the understatement of replacement cost for the Graham house. Graham received coverage for $850,000 but the house was appraised at $1.5 million approximately three weeks after Kemper provided coverage. Curtis arrived at the $850,000 figure because Graham told him that the house would cost $800,000 to construct. Curtis then added a $50,000 cushion to insure proper coverage. Kemper does not argue that Curtis was negligent in calculating this original sum. However, Kemper does argue that when Curtis met with Graham on February 26, 2003, and learned that the house had been appraised for $1.5 million, that he was negligent in failing to alert Kemper to the discrepancy. Although Kemper argues that Curtis had Graham sign a contract on February 26, 2003, the evidence indicates that the insurance on the house was already bound, and that the contract was for the Agency's files but was not intended for and was not sent to Kemper.

The tort of negligent misrepresentation usually requires that an individual affirmatively provide false information to someone who then relies on that information. Here, there was a failure to disclose, not a false statement made. Nonetheless, Kemper also asserts that Curtis <u>fraudulently</u> misrepresented information by failing to disclose to Kemper that the Graham house was appraised for $1.5 million when he found out on February 26, 2003. Therefore, Kemper is not challenging Curtis' initial valuation of the Graham house, but rather his failure to report the appraisal value when discovered.

Under North Carolina law, when a party owes a duty to speak, but fails to provide information, the party may be liable for fraud. See Setzer v. Old Republic Life Ins. Co., 126 S.E.2d 135, 137 (N.C. 1962) (holding that silence, when there is a duty to speak, can result

in actionable fraud). Specifically,

> Silence, in order to be actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances * * * the silence must, under the conditions existing, amount to fraud, because it amounts to an affirmation that a state of things exist which does not, and the uninformed party is deprived to the same extent that he would have been by positive assertion.

Id. (quoting 23 Am Jur., Fraud and Deceit, Section 77). Therefore, the first question that the court must address is whether Curtis owed a duty to Kemper to alert Kemper of the new appraisal value of the Graham house.

Kemper asserts that the Agency was Kemper's agent and so it owed a fiduciary duty to Kemper to disclose all information that it knew about the Graham house, whenever that information became available. Compl. at. 6. Kemper and the Agency entered into a contractual agreement in which the Agency was described as Kemper's "agent." Nonetheless, the fact that the agreement describes the Agency as an "agent" is not dispositive. "Unless there is but one inference that can be drawn from the facts, whether an agency relationship exists is a question of fact for the jury." Hylton v. Koontz, 532 S.E.2d 252, 257 (N.C.App. 2000). Under North Carolina law, there are two main elements of the principal-agent relationship: (1) the agent's authority, either express or implied, to act for the principal, and (2) the principal's right to control the agent. Phelps-Dickson Builders, LLC v. Amerimann Partners, 617 S.E.2d 664, 669 (N.C.App. 2005). Here, there are questions as to what extent the Agency could act for Kemper, the principal, with regard to the Graham house because the Agency could not bind Kemper for coverage in excess of $500,000. See Lumbermens Mutual Casualty Company v. Franey Muha Alliant Ins.

11

Servs., 388 F.Supp.2d 292 (S.D.N.Y. 2005) (concluding, in a case involving New York law, that an insurance agency that solicits and binds certain types of insurance for Lumbermens was an agent of Lumbermens with regard to transactions where the agency had authority to bind Lumbermens but that the agency question was not clear with regard to transactions outside of the agency's binding authority).

Nonetheless, even assuming an agency relationship did exist between Kemper and Curtis, a claim for fraudulent misrepresentation will not lie unless Curtis concealed from Kemper a material fact "reasonably calculated to deceive, made with intent to deceive, which does in fact deceive, resulting in damaged to" Kemper. Deans v. Layton, 366 S.E.2d 560, 565-66 (N.C. App. 1988). On February 26, 2003, approximately three weeks after Kemper bound coverage of the Graham house, Curtis found out that the Graham house had been appraised for $1.5 million. Kemper was supposed to conduct its own appraisal on March 7, 2003, although the inspection was postponed and actually took place a few weeks later. An inspector submitted a report dated March 26, 2003. The report estimated the replacement cost of the Graham house at $1,634,442.00, and noted that there were no fire hydrants in the vicinity of the house. Def. Motion for S.J., Tab 1 at 1&2. According to notes made by the inspection agency, the report was first made available to Kemper on its website on April 11, 2003. The Graham's house burnt down on April 17, 2003. Kemper did not access the report before the Graham's house was destroyed.

It is difficult for the court to conclude, based on these facts, that Curtis engaged in fraudulent misrepresentation. There is no evidence that Curtis acted with the intent to deceive Kemper. Kemper had already bound the insurance on the Graham house and Curtis knew that Kemper had commissioned an appraisal of the house, which was to take

place in a few weeks. Although the court agrees that there are genuine issues of material fact with regard to Curtis' conduct for a claim of negligence, as discussed below, the law makes clear that the alleged conduct does not constitute fraudulent misrepresentation. Accordingly, summary judgment on the claims of negligent misrepresentation and fraudulent misrepresentation with regard to the increase in the appraisal value of the Graham's house is appropriate.

B. Negligence

The Agency also argues that summary judgment is appropriate on Kemper's negligence cause of action. Kemper asserts that Curtis acted negligently in failing to disclose the much higher appraisal value of the Graham's home, when he became aware of it. Under North Carolina law, "[n]egligence has been defined as the failure to exercise proper care in the performance of a legal duty which the defendant owed the plaintiff under the circumstances surrounding them. The traditional elements of actionable negligence are the existence of a legal duty or obligation, breach of that duty, proximate cause and actual loss or damage." McMurray v. Surety Federal Sav. & Loan Assoc., 348 S.E.2d 162, 164 (N.C. App. 1986).

A determination of negligence is dependent on whether the Agency owed a duty to Kemper and whether, if a duty did exist, that duty was breached by Curtis' failure to immediately report the increased appraisal value of the Graham house to Kemper. Agency determinations are best made by the jury. Hylton, 532 S.E.2d at 257. In addition, whether a party exercised the requisite degree of care is also a jury question. Jenkins v. Theaters, Inc., 254 S.E.2d 776, 779 (N.C. App. 1979).

The Agency argues that a determination about the standard of care requires expert

13

testimony, which Kemper has failed to provide. The court is unconvinced that this case is one that requires the assistance of expert testimony. North Carolina courts have held, in the context of legal and medical malpractice, that expert testimony is required to determine the applicable standard of care unless the case presents a situation "where a jury, based on its common knowledge and experience, is able to decide those issues." Erler v. Aon Risks Servs. Inc. of the Carolinas, 540 S.E.2d 65, 69 (N.C.App. 2000). It is the court's opinion that whether Curtis owed Kemper a duty to disclose, and if so, whether he breached that duty, is an issue that the jury, based on "common knowledge and experience," would be able to decide. Accordingly, summary judgment on this claim should be denied.

C. Contractual Issue

Finally, the Agency asserts that summary judgment should be granted on Kemper's claim of breach of contract. "The elements of a claim for breach of contract are (1) existence of a valid contract, and (2) breach of [the] terms of the contract." Poor v. Hill, 530 S.E.2d 838, 834 (N.C. 2000). The clause of the contract that Kemper asserts the Agency breached provides:

> The scheduled(s) attached hereto and the rules and regulations of Company, as contained in Company's underwriting manuals and manuals of procedure and as may be announced by Company from time to time, shall be binding upon the parties the same as though printed herein prior to the signature, subject nevertheless to the terms and provision of this Agreement.

Plaint. Resp., Ex. C at 3. Kemper argues that the Agency breached this term of the contract when Curtis learned of the increased appraisal value of the home on February 26, 2003. Kemper admits that the Agency followed Kemper's regulations when it initially

14

obtained permission for coverage of the Graham house at $850,000, but that when Graham told Curtis, after coverage had been bound, of the new appraisal value, the Agency "no longer had authority to continue with coverage" and breached the contract.

The court is unpersuaded by Kemper's arguments. The court cannot see how the Agency breached the rules and regulations of Kemper by failing to alert Kemper of the new appraisal value when Kemper already had bound insurance for the home. The insurance for the Graham home was no longer under the Agency's authority because Kemper had approved coverage. Kemper has not pointed to a <u>contractual</u> obligation that would have required Curtis to immediately alert Kemper to a change in appraisal value. Accordingly, summary judgment on this claim should be granted.

## CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Defendant the Agency's Motion for summary judgment be **GRANTED** as to (1) the negligent misrepresentation claim regarding Fire Protection Class; (2) the negligent and fraudulent misrepresentation claims regarding the understatement of replacement cost; and (3) the breach of contract claim. The court **RECOMMENDS** that the Agency's motion for summary judgment be **DENIED** as to (1) the negligent misrepresentation claim regarding the fire hydrant dystance and (2) the negligence claim regarding the understatement of replacement cost.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum

and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This 12th day of August 2008.

DAVID W. DANIEL
United States Magistrate Judge